Your Honor, here to give you this Honorable Appellate Court for the Second Judicial District is now back in session, the Honorable Donald H. Thompson. Thank you. Good morning. Please be seated. Mr. Marshall, would you kindly call the next case on the Court's docket, please? Yes, sir. Your Honor, the second case on the docket is 42-22-0078, Magdalena Krewionek, and it falls aloft from South Street on Gibson Cove in the magnitude correction of McKnight v. B. S. Thank you. Mr. Schneider, on behalf of the appellants, you may proceed. Thank you, Your Honor. Good morning, Justice Burkett, Justice Hudson, Justice Brennan. May it please the Court, my name is Garrett Schneider. I represent the plaintiff appellants in this matter. Your Honor, there are two straightforward issues of statutory construction at issue in this case. When the legislature first passed the Illinois Health Care Right of Conscience Act in 1977, they did so using broad terms. They did not use words like patients and doctors. They used all persons. They did not describe certain types of health care that would apply versus certain types that would not. They used words like all and any. They did not use words like context or in the circumstance of. They used words like because of. So there are two issues in this case. The first issue deals with the Act as a whole and asks whether the Act, in fact, protects all persons from any manner of discrimination because of that person's refusal to accept, obtain, receive, participate in any way in any form of health care. And, Your Honors, if you just look at the plain language of the statute, the plain language of the statute is that it does not refer to all persons. It uses any manner of discrimination. And as this Court held in the Roehouse v. Martel case, that definition is expansive. It simply applies to everyone. Well, but the language of the statute doesn't refer to medical services? Yes, Your Honor. And it does. And Dr. McKnight is focused on that definition of health care, but he ignores Section 5, the anti-discrimination section, which uses the words because of. A claim under Section 5 has three ingredients, as this Court held in Roehouse. There has to be some type of religious opposition to health care, to participating in any way in any particular form of health care. There has to be some type of adverse action on the part of the defendant. And there needs to be some type of causative nexus between those two things. And that's what we have here. Ms. Kranowek. Why couldn't the legislature, if they wanted it to apply to all circumstances, irrespective of whether you're providing services to third parties, which is what the defendants are arguing, or whether or not it applies to a person who's working in a health care facility, couldn't they have said if they intended to apply to all people, as you're suggesting, that it applies to all people under the circumstances, irrespective of whether it's services or not? But it doesn't say that, does it? It does, Your Honor. It says it shall be unlawful for any person to discriminate against any person in any manner because of such person's conscientious refusal to receive, obtain, accept, participate in any way in any particular form of health care services contrary to his or her conscience. And then in Section 2, the public policy section, the General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive, or accept health care services. They – the legislator could have definitely used words like patients, doctors, providers, that type of medical language, but they didn't. They used all persons. And unless Dr. McKnight is contending that Ms. Cronowick and Ms. Brasowski are not persons, the Act applies to them. Well, let's assume that ostensibly the Act does apply. I think your biggest hurdle is getting around Section 13-5. Yes, Your Honor. The order was entered clearly, providing that they, you know, the governor had the right to direct the vaccinations and the preventative measures, and you're taking issue with that. It's a little bit of a different – a little bit of a different argument, Your Honor. So Governor Pritzker's executive order, which does not – it's not in the record. This is something that the appellees are adding in their brief. Well, we can take traditional orders. Of course, Justice Burkett. But the executive order discussed testing or vaccines. Dr. McKnight's policy was only vaccines. Okay. And I'm – I apologize, Justice Hudson. I forgot the rest of it. You disagree with the Fourth District majority in Glass, correct? Yes, that's correct. And why is Glass wrong? Why shouldn't we follow Glass? Yes. So Glass said that Section 13.5 is an interpretive aid, but Section 13.5 does not interpret the other sections. There's some confusion about how recent amendments affect prior decisions. And I think that this Court's case in the first mortgage court versus Dena, I think, does a really nice job of explaining how that works. And the rule is that, as the Supreme Court held in Sinelli, the legislature can change the law whenever they want. That's not the issue. The issue is not whether the law is effective now. But what's – the Section 13.5, it doesn't – it doesn't actually interpret anything. So in other cases that I presume the – this treatise used, dealt with other cases where they actually changed the law. To put it in this context, if the legislature changed Section 5 or they changed Section 2 or 12 and made it so that it excluded certain forms or they changed the definition of persons to only refer to patients or providers or something like that, then that analysis would come into play. In this case, however, we have a – We're talking in this case about a legislative creative remedy, correct? Yes. And 13.5 directly addresses the remedy, correct? The application of the act to your clients, correct? It applies – it would say when there's an affirmative defense. Right. And the act, Section 13.5, states that this section shall apply to all actions commenced or pending on or after the effective date of the amendatory act, et cetera. Yes. So how do we get around that? Even if we would agree with your position, we have to follow the law. Absolutely, Your Honor. And my position is that the act applies retroactively. There's no way around it. That's very clear in Sinelli. It's very clear in First Mortgage Court v. Dena. And that case actually is a very nice illustration for this case. In that case, the – there was – it was a foreclosure action, and the debtor's defense was that First Mortgage was not licensed in Illinois, and so the mortgage was void. The Second District agreed with the debtor, vacated the judgment, and subsequently the legislature came in and amended the law to say that just because a mortgagor is not licensed in the State does not void a mortgage contract. This Court – and then what's – So let me just – we all agree that 13.5 applies to all pending cases. This was a pending case. So my question is, and I think our question is, why isn't 13.5 now fatal to your clients? Okay. And I agree that it's effective, but I do not agree that it applies. I just want to be clear on that. And that's because – Why is it because of how you're interpreting the statute? Yes. Okay. So Section 13.5 is an affirmative defense in that it requires Dr. McKnight to bring up something not appearing on the basis of the complaint, not part of the elements of Section 5, and it requires him to prove that defense. And that defense is whether his measures are intended to prevent the Trans-District Attraction of COVID-19. Now – So you're saying a 2619 motion can never be had. I – it could. Because of 13.5. I'm saying that a 2619 motion could work if the plaintiffs – I don't think it would work in this case because we – there's a factual dispute. But in the right case, it could if it's uncontested that the vaccine policy is intended to prevent COVID. We dispute that in this case. But what is it designed to prevent? I don't know, Your Honor. I think, in all fairness, and there's nothing – there's no evidence of this in the record. There's nothing like this in the record. But I think that the current position of the CDC, the FDA, the Federal Government is that the vaccines are effective at preventing illness and hospitalization, but they're not effective at preventing the actual contraction or transmission of COVID. But doesn't that make the transmission less likely? It might, but the legislature didn't use words like less likely or mitigate or reduce. The legislature used prevent. And here prevent is unambiguous. It means to render impossible. Well, why couldn't it mean as the hinder? Yeah, why does it have to be a hinder? We've all looked at the Oxford English Dictionary definition, and it seems to be broader than absolutely makes impossible. Well, and I would say that makes impossible I think is probably too high of a level in this case because of the words intended to. What was the date of the order to get vaccinated? What was the date? It was in September of 21. Bear with me a minute, Your Honor. So I think we all know that what the CDC was saying then is different from what they're saying now. Right, exactly. What originally it was, this vaccine will prevent the transmission, will prevent the illness. So it would be September, we say September 2021, but even by that point, it wasn't very loud. But people like Rochelle Walensky, who's the head of the CDC, is saying that while the vaccines remain effective at preventing serious illness, they can't prevent transmission or contraction of COVID. At the very least, Dr. McKnight should have to prove this defense in the sense that it's not. He's not negating one of the elements of a Section 5 anti-discrimination claim under the Conscience Act. He's seeking to bring up something affirmative, and he should have to prove that with evidence. And he would have to prove that it's impossible, and this vaccine would have to be – would mean it has to be impossible. No, Your Honor. Because I don't think that there's going to be much dispute that there's no vaccine that's 100 percent effective. Well, I thought that you used the word impossible earlier. Well, I think that the full definition of intended to prevent, if the statute said measures that will prevent COVID, then I think the standard has to be impossible. But I think that where the – But it didn't say that. It didn't say that. It said intended to prevent, which I would say is reasonably likely to render impossible. And what definition – where did you get the definition of that from? It's – there's – I look at it as there's two ways to look at it, subjectively or objectively, in terms of looking at intents. To look at it subjectively would put the intents in the person making the policy. And in that case, someone could basically say whatever they wanted, and as long as they said, because I'm intending this policy to prevent COVID, that policy is valid. And I – in light of Section 2's public policy, I don't think that that's a technical construction. Conversely – I'm talking about construction. Aren't you sort of violating one of the cardinal rules of statutory interpretation? We're not supposed to read things into the statute and speculate what it means? Well, I think that that's fair when it's an unambiguous – when it's using unambiguous language. But here, where the statute says measures intended to prevent, I think that there's an open question as to whether it's the measures that are intended to prevent, which would be an objective standard, or whether it's the person who is making the measures and whether that person intends the measure to prevent COVID. I think in light of Section 2's public policy, that says that it's the policy of the State of Illinois to prevent – to protect the right of all persons who refuse to take medical steps that would violate their conscience. Well, speaking of intent, what do you think the intent of the legislature was in enacting 13.5? I think that the – Because it seems implausible that it's as restrictive as you're suggesting. I think that the legislature intended the Section 13.5 to protect measures that actually will prevent COVID, or at least are substantially likely to. So if there was scientific evidence that said in September of 21 that the vaccines are effective at preventing COVID, then I would – I think that we lose. But here, you have the heads of – You're right. You're right, Your Honor. We're only supposed to look at the plain language of the statute. And here, the plain language of the statute uses the phrase intended to prevent. And looking at it and looking at Dr. McKnight's construction, where he refers to the measures that are intended to prevent, it seems natural that if we're going to balance the public policy in Section 2 with Section 13.5, that the affirmative defense would only cover measures that actually work. If a measure is not effective at preventing COVID, why does that trump someone's right to oppose religious – or, excuse me, right to oppose medical treatment that conflicts with their conscience? And who determines whether or not it's effective? Well, it would be the jury. There would be – or the fact finder. You would have an expert who would say that Dr. McKnight's policy is effective. You would have an expert, presumably, that would say that his measure is not effective at preventing COVID. And the jury would decide who's right. This is what Justice Steedman referenced in his dissent in the Glass case. And I think it makes sense here. I'm going to touch on Section 6.1, which deals with the hospital's – its precondition for the hospital to seek protections under the act. That doesn't apply in this case. The trial court didn't reference it, but because it was brought up in the briefs, we're addressing it here. But that – Section 6.1 has no application in this case. It deals with hospitals. Thank you very much, Your Honor. No questions? Not at this time. Thank you. Thank you very much, Mr. Schneider. And you'll have an opportunity to address the Court again on revote. All right. Mr. Wolf, you may proceed. Thank you, Your Honor. May it please the Court. My name is Franklin Wolf. I represent Apo Lee, Dr. McKnight. Appellants here state no claims for relief under the Illinois Health Care Right of Conscience Act. As Your Honor has noted earlier today, Section 13.5 bars their claims in their entirety. 13.5 applies to every claim under the statute. The statute – 13.5 is not ambiguous in this regard. It's not a violation, quote, to take any measures or impose any requirements, end quote, intended to prevent contraction and transmission of COVID-19. Further, Section 13.5 states, quote, It is not a violation of this Act to enforce such measures or requirements. The legislature did not miss words. It applies to – Section 13.5 applies to every section of the Act, including – How do you respond to his argument that it's ambiguous? You've heard his argument. How do you respond to it? That –  Well, 13.5 is not ambiguous. Rather than acknowledge the plain allegations and arguments that appellants have made, they're looking to definitions of intent and prevent. Now, addressing the issue of prevent, as Your Honor has noted earlier today, prevent has a more expansive definition of render impossible, and taking appellants' definition of prevent to mean render impossible would lead to the absurd and unjust results that were extremely cautioned against in the Cassidy Act, where if you have a literal reading of statute where you require impossibility, that – the absurd results must be avoided. As Justice Burkett noted earlier today, the Court may take judicial notice of the governor's executive orders. And in the governor's executive order from August of 2021, he specifically noted that COVID vaccines can help prevent the spread of COVID-19. It's a very specific language in the executive order. And taking that as judicial notice here, there's no ambiguity that COVID-19 vaccines, which is the only measure intended to prevent COVID-19 that appellants have alleged, it's clear that what Dr. McKnight purportedly ordered here is under the purview of 13.5. Now, as to the definition of intended to, which is the other ambiguity that appellants claim, appellants – May I interrupt? Yes, Your Honor. So I don't have a problem with any ambiguity as it relates to intended to prevent. But I want to focus on the next part of it. Intended to prevent contraction or transmission of COVID-19. Is there an argument that we don't have enough facts to say whether that has – that the vaccine does or does not do those things? And if there is an argument, doesn't that require the fact finder to answer that question? I don't think there is an argument, Your Honor. Why? Well, for one, in their complaint, appellants alleged that they were instructed purportedly to get a vaccine against COVID-19, not undertake any sort of blood draws or – I'm talking about the statute. And I'm talking about the vaccine. Do we know that the vaccine prevents contraction because it doesn't seem to? Do we know that it prevents transmission? Because if someone has it, the vaccine doesn't seem to prevent transmission. Well, the appellants acknowledged as such in their brief that vaccines prevent the transmission of disease. Look into page 21 of their opening brief. Quote, there is no dispute that vaccines generally are drugs because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man. This is a concession that appellants have already made. But I don't read that as a concession that the COVID-19 vaccine prevents getting it because we all know it doesn't because a lot of people have it and they're getting it. I mean, certainly we're not going to ignore that reality based on a sentence that we might be misapplying, ascribing too much to in the brief. So my question goes beyond that quote-unquote concession. Just realistically, I think it's fair to say we know that a lot of people who have gotten the vaccine have subsequently gotten COVID, so it doesn't prevent getting it in all cases. Well, I think the responsive question to that is what was known in August and September of 2021. As Your Honors noted earlier today, what was known and understood at that time is different from what's known and understood now. And I will look no further than the governor's executive order saying explicitly that COVID-19 vaccines can help prevent the outbreaks of COVID-19, especially in vulnerable populations. Today we know that even somebody who's been recently vaccinated or boosted can still get COVID-19. Correct, Your Honor. And the range of symptoms will vary from severe and hospitalization to just mild or no symptoms at all, just symptom proof they have COVID. So it's a spectrum, right? Well, I think it varies depending upon what the understanding was at the time that the alleged order was issued. At the time this alleged order was issued in August or September of 2021, this was the understanding that it would prevent, if at the very least hinder transmission of COVID-19. Sitting here today in August of 2022, our understanding may be different. We were firing people back then, police officers, military personnel, hospital workers, other health care workers, because they refused to get the vaccine. Correct, Your Honor. And that's the sort of topic that the governor's executive order brings up, in seeing the Biden versus Missouri matter, where the justices noted that It's pretty clear now that a lot of those executive orders, if we knew then what we know now, they would not have been issued. I think that's fair to say, but we knew then what we knew then. And what we knew then was that the COVID-19 vaccine prevents the transmission of COVID-19. And that's exactly what we have in this case. Mr. Stewart, isn't it important as you go back and forth on this issue, are we overlooking a very important word in here? It doesn't say it will prevent contraction or transmission. It says it's intended to prevent. There's a difference between saying it will and what it's intended to do. Correct. Clearly it was intended to do. If it said it will prevent, Mr. Schmider, it might have a more compelling point. It doesn't say that. I agree with you, Your Honor. And that's exactly what's in the complaint, where appellants were purportedly instructed to obtain a vaccine against COVID-19. This was in the context of the governor's executive order saying that the COVID-19 vaccine, it can help prevent those outbreaks. It can prevent the transmission of the disease to others, particularly in vulnerable populations. The statute itself doesn't define intended to. And as we noted in our brief, the plot matter, in interpreting the Illinois East Dropping Act, that statute similarly did not identify whether intent was objective or subjective. Either way, appellants' preferred public policy approach to intent is not referenced in the statute at all. And similarly, that wasn't considered by the Plot Court. Now, in the Plot Court, they evaluated intent under a subjective framework. But here, because there's no delineation between whether or not Section 13.5 is under an objective framework or a subjective framework, we can look at Dr. McKnight's alleged actions under either. And looking at his alleged actions under an objective framework and looking at the allegations in appellant's complaint, there's no dispute, at least for purposes of the motion to dismiss and for purposes of the appeal, that Dr. McKnight purportedly instructed two of his employees, not patients, employees, to obtain one of the vaccines against COVID-19. Not a particular brand, not a particular drug, one of the vaccines against COVID-19. And he left it to his employees to get one of those vaccines. And this was in the context of, again, the governor's executive order stating that the COVID-19 vaccine can help prevent those outbreaks. It can help protect those in vulnerable populations. And we've steered clear a little bit of this, but I come back to appellant's statement in their opening brief, which they've tried to characterize as a misreading, which vaccines are intended to prevent disease in man. That's a definition, it's language that appellants themselves have cited here. Taking all of these facts, taking all these allegations, taking appellant's own arguments, there's no dispute here that Dr. McKnight's alleged actions were intended to prevent the contractual transmission of COVID-19. And we touched on this a little bit before, at least during appellant's initial presentation. There's no dispute here that 13.5 applies. The language of the amendment is very explicit. And as noted in the Deke Center matter, where that clear statement is evident from the statute, amendments can apply to rights and cases retroactively, even midstream litigation, which is exactly what we have here. Again, as noted before. So can I just interrupt? All of us agree that potentially it applies, I think, and I think the appellant does, too. So I don't think we have to discuss that. Let me ask this question. Are you suggesting that the analysis might be different today than it is for your client? In other words, we're focusing back in 2021, in this case for your client, but maybe it would be something that would have to go to a fact finder today, or are you not saying? Well, if the decision – that comes down to how intended to is interpreted in a context of when the decision is made and what is known at that time. At the time that Dr. McKnight's purported decision was made, the science was, and the governor noted, that COVID-19 vaccines prevent outbreaks, they prevent the transmission of the disease, and they protect vulnerable populations. Even at that time, there were countervailing views. There were studies that showed the opposite. We didn't hear much about it because social media was shutting down those reports. So there was a dialogue that was going on. It was just not being heard. Only one side was being heard. I understand your honest concern about that dialogue. At the same time, what was taken – what was ordered by Governor Pritzker at the time was the science is this, the science says the vaccine prevents the contraction or transmission of COVID-19. Lots of things get sent to social media where they may or may not be able to be verified. The executive order, I think, stands in a different realm than discussions on social media. The point is that there was a dispute about the effectiveness of the vaccine as to whether or not it would even prevent COVID and, in fact, might have detrimental – might be detrimental to people who get it. I'm not certain as to the specifics that you're referring to. No, I understand what you're saying about the governor's order, the state of the science that was publicly being disseminated, and Governor Pritzker's order is certainly relevant to that. Right, and I do agree that Governor Pritzker's order is relevant to that, including his statement that COVID-19 vaccines prevent outbreaks and protect those that are vulnerable. And that's not the only measure that's at issue here. As we've discussed extensively, Section 13.5 acts as a complete bar to appellants' claims. What's also at issue here and what was the primary focus of the trial court's decision was the issue of whether or not, even without 13.5, the act applies at all to appellants' claims. Now – Explain – as it relates to that, explain why the Cohen case doesn't – shouldn't prompt us to side with the appellant on that question. Sure. The plaintiff in the Cohen case was a patient at a hospital. It still has to do with the context of that patient-provider relationship. Now, the entire act hinges upon this definition of health care services, which the first few words are any phase of patient care. That definition of health care services, that phrase, any phase of patient care, is incorporated throughout the statute, including Section 5 for the anti-discrimination provisions. And counsel made the argument that the discrimination provisions provide for any person. But at the same time, the statute itself goes further than that. In Section 5, it says, Discrimination is not permitted because of such person's conscientious refusal to receive, obtain, perform, assist, counsel, suggest, recommend, refer, or participate in any particular form of health care services contrary to his or her conscience. That definition of health care services, which de facto incorporates the phrase any phase of patient care, that's in the anti-discrimination provisions. Let's change the fact pattern just a little bit and say that Dr. McKnight instead is a hospital administrator and the person that's going to administer the vaccine is a hospital doctor. So it's going to happen in the context of the employer's business. How would that not change the outcome, or would it? Well, under the facts that Your Honor has described, it may change the outcome because there is potentially that patient-provider relationship. Because Dr. McKnight here was not actually administering the vaccine, that changes it. Yes. Versus order. Correct. Because it makes it different from that patient-provider relationship to an employment policy. And one is covered by the Health Care Right of Conscience Act. The other one is not. It may conclude with one sentence, Your Honor. Yeah, go ahead. Thank you. At the end of the day, the issue concerning patient care, that's a side issue to 13.5. For the reasons I stated today and in our briefs, we request that the Court affirm the dismissal of appellants complete. I thank you for your time. All right. Thank you very much, Mr. Moore. Thank you. All right. Mr. Schneider, you may address the Court in rebuttal summation. Thank you, Your Honor. Just a few points on rebuttal. First, appellant is conceding that there's a question of fact as to whether the vaccines were known to be intended to prevent the contraction or transmission of COVID. Counsel keeps talking about what the science says. Well, that's quintessentially a question of fact. It's not a question of law. Second, counsel keeps referring to this patient-provider relationship that's supposedly a requirement. There's nothing in the statute that talks about a patient-provider relationship. And as this Court said in Roehouse v. Martel, the question is whether it's there's a person who has religious opposition to health care, whether they told their employer of that opposition, and whether the employer took adverse action because of that opposition. That's this case. There's nothing about a patient-provider relationship. And the fact that the prior cases all had that as a common fact does not mean that the statute is cabin to those facts. That's not how statutory construction works. And Pritzker, President Biden, his administration, they're not expert witnesses. They're lay witnesses. In the executive order, even the Biden v. Missouri case, it's hearsay. It's not evidence. It would be compelling if it was a question of law. But here there's a question of fact. It needs to be done through expert exposition. And last, Your Honor, counsel refers to the Plott case. And the statute in that case is whether the defined conversation is any oral communication between two or more persons, regardless of whether one or more of the parties intended that their communication be of a private nature. And counsel is trying to use that statutory language to say that, in this case, there's no improper to find an ambiguity. Plott has nothing to do with this case. Plott would be much more analogous if the statute, if 13.5 said something like intended to prevent COVID, regardless of whether it in fact prevents COVID. Then I think it would be a much stronger case. But here, where the statutory language, where intended to prevent comes right after measures, the natural interpretation of it is to look to whether the measures are intended to prevent COVID, not whether the actor intends those measures to prevent COVID. Thank you very much, Your Honors. No, thank you. All right. Thank you. Thank you, Mr. Schneider. All right. That will conclude the arguments in this case. I'd like to thank both counsel for the quality of their arguments here this morning and what is a very interesting case and issue. The matter will, of course, be taken under advisement. And the court will issue a written decision in due course. We stand adjourned for the moment to prepare for the next case. Thank you.